Good morning, Your Honors, and may it please the Court. My name is Keith Hilzendegger. I'm with the Federal Public Defender's Office in Phoenix, and I represent the defendant in this case, Jose Antonio Liera-Morales. Before I talk about the Confrontation Clause issue in this case, I want to say a brief word about the rule of completeness issue. I'm sorry, would you keep your voice up? Pull that microphone close. Yes. I want to say a brief word about the rule of completeness issue. Four weeks ago tomorrow, this Court issued a decision called United States v. Vallejos that Judge Gould wrote, and I think the discussion in that case about the rule of completeness issue covers the issue in this case, because I don't see any difference between the reasons that the Court approved in the Vallejos case and what Judge Zips did here with the rule of completeness claim. So if the Court has no other questions on that issue, I'll go ahead and move on to the Confrontation Clause issue. Under Crawford v. Washington, where the declarant is unavailable to testify at trial, testimonial hearsay must be excluded under the Sixth Amendment unless the defendant has had a prior opportunity to cross-examine the declarant of the statements. Here, the district court erred by admitting the double hearsay statements of Agent Goyko that related threats made by a member of an alien-smuggling cartel in connection with a ransom demand relating to the victim in this case. This double hearsay was testimonial and, therefore, subject to Crawford for two reasons. First, Agent Goyko attempted to record the statements, which suggests that he sought to use them in a criminal prosecution of whatever member of the smuggler they could ultimately or whatever member of the cartel they could ultimately apprehend. And, second, Agent Goyko wasn't responding to an ongoing emergency because he was making this recording over 1,000 miles away from where the hostage was being held. That makes no sense to me. I mean, it's not like he's going to run out in his car and get the guy. That seems to me to sort of obscure the question. The language used is, you know, whether the primary purpose was to move forward with the prosecution. Here you have this sadly individual who's fearing that the son is, well, he's kidnapped, there's going to be money, is he alive, should we pay up the money? It's an emergency situation. So I don't see why, just because the officer is not on the scene, it somehow dissipates the emergency, cell phones, other texts. He can get law enforcement down there to go and do something. So maybe I'm missing something in your argument, and you can explain it to me. Your Honor, the recording here, the fact of the recording was entirely unnecessary to meet the emergency. Well, is that a standard? I mean, in other words, if the primary do you agree with me that the reason he made the call was because they wanted to see if this person was alive, right? That's a reason, yes. And the other reason they made the call, wanted to see if he's alive and what the situation is down there with the people who are supposedly holding him hostage, right? That's a reason, yes. And then you're going on to say, but you can't record that because you don't need to. And that somehow, in the legal calculus, changes the outcome. That's where I'm having some trouble. Because the fact of the recording, I just – it's unnecessary to help them, you know, locate the place where the other end of the call is. You know, they had all of these people in Tucson who were trying to use the triangulation and the geolocation equipment provided by the cell phone company to locate the place where the call was being made from where presumably the hostage was being held. They just needed somebody on the other end of the phone so they could maintain the link and continue to hone the accuracy of the geolocation equipment. Recording doesn't help promote the accuracy of the geolocation equipment. It just memorializes statements. Would it be – would it be inappropriate to take notes? The Supreme Court has said that one thing that suggests that a statement is testimonial is that it was recorded in the notes of a police officer. So – Is there a difference between taking notes and recording, other than it may be more accurate? You mean contemporaneous notes of what's being said on the call? Yes. Because that would be equally superfluous for the primary purpose of trying to rescue this hostage who's being held. Well, I don't quite get that. I've always been pleased when they do notes, so I know what's going on when I review a record. You're saying that you lose when you do the record. I'm saying that the statements are testimonial and should be excluded. Well, so on the phone call, they begin to talk about location and they talk about details and that sort of thing? They talk about the – the, you know, the amount of the ransom. They talk about when they want the ransom to be paid. Right. They talk about who's going to pay the ransom. Right. So you're saying that the officer ought to just say, okay, I don't – I have a pencil, so I'm going to put that down, put my computer down. I'm not going to record it. Okay. Chat away. And then he's left to his recollection in terms of them perhaps responding, a hostage team responding in terms of the amount of the ransom, some of the details, so that you can kind of set this up as a – as to have them walk into, in effect, a trap now that they've demanded the ransom. So it makes no sense to me in this kind of case where there is an emergency. They're trying to make sure that this person doesn't die, right? That's correct, Your Honor. And then – and so the rule we would say is, well, even if you're in an emergency, better not record it or take any notes. That's the rule. Because – because I are. Because you don't need to. Yeah. Because I can keep it in my head, even if I might make a mistake on the details. Well, but that's – that's the purpose of the cross-examination of the declarant. The person who would be testifying under the – under the Crawford analysis ideally is not the cop who is there assisting the recording. It's the declarant at the statements. And only if the prosecution can prove some reason that the declarant is unavailable would – Right. But what you're saying is you're hamstringing law enforcement that just because they recorded it, because they may need to go back and reference that as they move through their emergency operation, just because they recorded it, that it somehow is transformed into prosecutorial material as the primary purpose. So that's maybe where we're maybe talking past each other a little bit as – The primary purpose. Maybe you can address that. It's – it's – the – I mean, there's plenty of other tools at law enforcement – at law enforcement's disposal to locate a hostage. I'm not seeing how recording this phone call really helps them or hurts them in terms of the phone call. I'm not even seeing how it's relevant. I'm sorry, Your Honor? I'm even having difficulty finding where it's relevant. The fact that they recorded. Yeah. Where does that – where does that get us in the Sixth Amendment, where they recorded or they take notes? It's just an objective factor that I'm pointing the Court to, so that the Court can have something objective to say, well, here's a reason why it's testimony. Start off with who's the declarant you're going for now. Is this the mother? No, Your Honor. I clarified that in the brief, that since the mother testified, her statements would be admissible under Crawford anyway. Okay. And she was cross-examined. She was. Was there an objection made at trial, whether the person on the other end that you're talking about now was – was – created a Sixth Amendment problem? This issue, Your Honor, was the subject of motions in Limonene that the district judge – You could start off with a yes or no. No, Your Honor. There was no objection at trial. But, however – But so you've got a waiver problem starting off. Well, I – I – Never objected to. District court never had a chance to handle it. I disagree that there's a waiver problem, Your Honor, because this issue was the subject of motions in Limonene, and the judge made a ruling. And this Court's case law makes clear that when there's an evidentiary issue is the subject of a motion in Limonene, you don't need to renew that objection at trial. What was – what was the ruling in Limonene? Judge Zips ruled that the statements were admissible under Crawford because there was an ongoing emergency and, therefore, they met the exceptions at fourth in Michigan v. Bryant. Excited utterances? I'm sorry, Your Honor? Excited utterances? Well, there were hearsay and confrontation rulings in this case. And I'm not challenging the hearsay except the rulings. I'm just challenging the confrontation ruling. But, yes, Your Honor, Judge Zips ruled not only were there excited utterances, but there were also present sense impressions. Would it matter in the sense that you've got this Agent Guico who's at issue here, but then you have the mother's testimony that would seem to establish all of the elements of the crime, and so is it harmless in any event? Well, her testimony still repeats what she heard the other person on the end of the hour. So that aspect of the hearsay is still subject to confrontation clause analysis. And since I see my time has expired, Your Honor, if there are no further questions. All right. Good morning. May it please the Court, Counselor. My name's Kyle Helia. I'm here on behalf of the United States. The issue before the Court involves a mother whose son is being held hostage, presumably in Arizona, and she's receiving threats that he's going to be killed. If she doesn't pay amount of money, which she doesn't have. Eventually, she calls 911. They relay her to Tucson. ICE agents in Tucson eventually get the case. They then contact the Houston office, and the Houston agents reach out to this mother. In the meantime, in Arizona, they're getting the GPS location coordinates of the phone number where these calls are coming from. The agents in Tucson instructed Agent Guico to have the mother place a call with two reasons in mind for this call. The agents wanted to ensure that Frankie, the person being held hostage, was with the people who actually had the phone. So they wanted to get Frankie on the line to ensure he was near the phone that they were tracking. And the second purpose was that they wanted to set up a future meet with these people to actually pay the money for Frankie and essentially get him out of harm's way and, of course, if all goes well, arrest the people doing this. The question before the court, I suppose, is, you know, what's the primary purpose of this call? And the court in Davis in Michigan v. Bryant laid out essentially four factors that the court should look for in determining the primary purpose. The first one is, is it to prove past facts or current events? Well, in this case, the recording is clearly on current events, and not only that, they're setting up future events. They're setting up a future meet, and they're trying to determine the current whereabouts of Frankie. So that factor certainly falls in the government's favor. Additionally, the court asks you to look at the current situation objectively and essentially, is it an emergency? I think as the court has hit on earlier, a mother's son being held hostage and threatened to be killed is clearly an emergency. And if there's any doubt that it was an emergency, it certainly became an emergency when during that phone call, the defendant put forth a 3 o'clock deadline the next day to have the money paid, or something, you know, I think as they alluded, bad or that they were going to kill Frankie. The third factor looks at the questions and answers given and what are they focusing on. You know, is it present or past events? Now, admittedly, in this case, the statements that came in were past events to the extent that Sonia gets off the phone and starts telling Agent Guico what happened. Agent Guico then testifies to that at trial. But the past event is only one or two seconds removed in that she had just hung up the phone with the people who were holding her son hostage. Stop right there. When Agent Guico testified to what she had told him when she got off the phone, was there an objection made? During trial, no. There was not an objection made. However, what I had done during trial was I filed a motion in limine to seek the introduction of these statements, primarily to avoid a long sidebar argument, because introducing this type of testimony I would expect would draw an objection and I wanted a clear record in this case as to what happened. So the district court ruled on this in a written order before trial, analyzing not only the hearsay issues but also the confrontation clause issues. So to the extent the defendant's attorney didn't object during trial, I don't think in good faith I would feel comfortable. You're not suggesting waiver. Yes. I don't think that would be fair to say, because I did this to avoid. No, we appreciate the candor in that, because once you have a motion in limine there's always some ambiguity, but if the defense counsel then has to jump up again, you keep doing that through trial. So I think that's exactly what I wanted to avoid. Right. So I wouldn't feel proper making that argument. The last factor the Court looks at is the level of formality in the questioning. Well, in this case, you know, Sonia just starts talking, she's shaking, she's crying, and they're outside, you know, the call was just recorded. It was kind of, you know, they're about to go on their way. There's not a lot of formality here. It's not like she came into an office, sat down to write out a prepared statement or swear out an affidavit. I mean, they're just essentially in her neighborhood getting this done, and so Agent Goyko can then relay this information back to the agents in Tucson. I know there is a statement somewhere in the record by Agent Smith, I think, saying, well, what he hoped to get from the call, and then he lays out the elements. How does that factor into the factors? I think it factors in favorably for the government because it shows, again, that what they're dealing with is a current event and a current emergency. They're not – these agents aren't getting together and going, okay, we're going to go try and convict Person X, who they actually don't even know who Person X is at this point. You know, when the Court looks at the reasoning in Crawford, it's very clear they're not preparing for trial or anything, but what they're really preparing to do is save this kid. That's what they're purporting. And to the point that the Counselor raised regarding that the 911 call was recorded, again, that's – I'm sorry – that this call, that the agents attempted to record this call, that's only one factor that fits into the, I would submit, the level of formality of the questioning. And the point I would like to make is that 911 calls are routinely recorded by nearly every 911 exchange, and the Court has already held that 911 calls have been found to be non-testimonial, and they were recorded. So I don't believe that the agents tried to record this helps the defendant in any way. In addition to this case, I think we have the actual statements that were put forth. And really, the statements the Court's looking at are that they wanted money for Frankie, that they were going to meet with this person, Tony, who was an undercover agent, to pay for Frankie, that there was a three-cock deadline announced, and then the actual conversation, or that Sonia was able to speak with her son. I mean, those are the four statements that are ultimately at issue here. Well, Sonia testified to two of those. She testified that they threatened Frankie. She just couldn't give the details. She said, no, they definitely threatened him again. It was Agent Goyko who said, well, what she told me was they said they were going to kill him. In addition, Agent Goyko really – the only things that he provided were the three-o'clock deadline, that the fact that the threat was actually he was going to be killed, and that Sonia indicated she spoke with her son, Frankie. So those are really the only statements that the defendant wouldn't have had an opportunity to cross – to cross-examine the person on, because they had the opportunity to cross-examine Sonia. So we have those statements there that are made – which I would submit were made by the defendant. And if these statements are made by the defendant, I don't see how the defendant has a right – how there can be a confrontation clause problem when it's the defendant making the statements. And additionally, if it's not the defendant making the statements, it's certainly a co-conspirator in this case making these statements in furtherance of the conspiracy. Again, in this case, by the defendant's own admission, he spoke with Sonia six different times. He told the agents that he spoke with her that night and that he put Frankie on the phone, which is exactly what happened during that call. Additionally, he had the phone in his possession when the agents arrested him, and he was privy to all the details of this proposed meet with Tony. And he actually went by the proposed meet and later left it, and after the meet, he called Sonia again to speak with her. And then Frankie testified that every time he spoke with his mother, it was the defendant who handed him the phone. So really, we have a situation here where the statements that have been made were actually made by the defendant himself. So he's claiming a right to confrontation over statements that he himself made. And I don't think that argument gets him anywhere. And additionally, the defendant admitted that he was part of an alien smuggling ring. He indicated that he was working for an unknown man to pay off his smuggling fee. So by his own admission, he's part of a conspiracy. I think the only way the Court, however it chooses to analyze this case or this issue in the case, the only way that the Court can side with the defendant is if they find that the defendant didn't make, wasn't the person on the other line of the phone call, and that the person on the other line of this call wasn't a co-conspirator who was making statements in furtherance of the conspiracy. The Court would essentially have to find that that phone call, that that conversation came from some unknown third party that really had nothing to do with the case. And given the evidence in this case, I simply don't, I would submit that's not possible. I would briefly like to touch on the rule of completeness issue. And sheepishly, I'm unaware of the Valeos case that the defendant cited to, but I would submit to the Court that the court didn't abuse its discretion in admitting the statements the way it did. I don't think there was a 28-J letter submitted. The defendant cannot point to any way that these statements were misleading to the Court. The Court analyzed each statement the government brought in and actually made the government change several of them to ensure that they weren't distorted or misleading. This Court's decision in Lopez-Figueroa is essentially exactly what the government did. And so with that, I see that my time is up, unless there are any further questions. Here's not. Thank you. Thank you. You've used up your time, but I'll give you another minute for rebuttal if you would like it. All right. Thank you. The case just argued, United States v. Lira Morales, is submitted. Thank you both for your argument. I'm coming from Arizona this morning.
judges: Wallace, McKeown, Gould